# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DENNIS SOLOMON,** | ) |
|     **PLAINTIFF PRO SE** | ) |
| **v.** | )   **CIVIL ACTION NO.** |
| **FRANK FREDRICKSON,** | ) |
| **MICHAEL WATERSTONE,** | ) |
| **KAMALA HARRIS** | ) |
| **JOE BIDEN** | ) |
| **DOUGLAS WOLF,** | )   **JURY TRIAL DEMANDED** |
| **VINCENT LECLERC** | ) |
| **ET AL** | ) |
|     **DEFENDANTS** | ) |

*(stamp: FILED IN CLERKS OFFICE — U.S. DISTRICT COURT DISTRICT OF MASS. — 2020 OCT 19 AM 12: 46)*

## COMPLAINT

*"A man's useful inventions subject him to insult, robbery, and abuse"* Benjamin Franklin, *Address Of The Advocate Of The Patentees, Inventors Of Useful Improvements In The Arts And Sciences: In Defense Of Mental Property 9 (Dec. 19, 1806).*

## PREAMBLE

**PLAINTIFF DENNIS J SOLOMON** brings this action pursuant to 42 U.S.C. 1983, 18 U.S. Code § 1964(c), 18 USC 1836(b)(1) and other statutes, seeking relief and damages to remedy violations of his rights secured by the 1st, 2nd, 4th, 5th, 7th and 14th Amendments to the United States Constitution, and damages suffered from the Defendants ongoing criminal enterprise engaged in economic and defense espionage, interference with interstate commerce, and corrupt political practices. The Complaint avers that the Defendants conspired and engaged in unlawful acts of intimidation, threats of violence, assault, obstruction, fraud, forgery and bribery to abridge the Plaintiff's Constitutional rights to petition for redress of grievances; exercise the rights of personal, family and community protection, and security; be free from unreasonable searches and seizures; receive due process; resolve substantial civil disputes before a jury; and receive equal protection of the Laws. The Defendants were principally motivated by their religious bias against the Zionist-Balfourist Jewish beliefs of the Plaintiff, and to protect their related corrupt political and financial enterprises. Said unlawful and criminal acts were in violation of Federal, State Laws, executed primarily by officers of the Courts and State government official acting under the color of State Law, and in violation of the Economic Espionage Act.

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 based on 42 U.S.C. §1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiffs' state law claims is pursuant to 28 U.S.C. §1367.

2.  This Court has personal jurisdiction over each of the Defendants because a majority of Plaintiffs and Defendants reside in the state of Massachusetts, and inter alia, acted, acts and threatens to act under the color of laws, policies, customs and/or practices of the State of Massachusetts or California to abridge the Constitutional Rights and cause damage to persons within the geographic confines of the State of Massachusetts.

3.  Venue is proper pursuant to 28 U.S.C. § 1391. The Eastern Division is appropriate pursuant to LR 40.1(d)(1)(C) because the Plaintiff and principal Defendants reside in the Eastern Division.

## SUMMMARY OF THE CASE

4.  In 1989, the United States Air Force Intelligence Directorate requested that Plaintiff Solomon direct a multiphasic project related to advanced computing, remote surveillance and targeting, biowarfare defense and C4I information systems including visualization technologies.  Part of the Plaintiff's project was conducted with MIT LCS Director Michael Dertouzas, MITRE scientist Dr. Fred Wefer and MIT Professor Stephen Benton.

5.  From 1992-1998, Teledyne, Inc. unlawful schemed to defraud the United States, sabotage and delay a phase of said project by fraudulently certifying a substandard product, and scheming to obtain Plaintiff's trade secrets employed in highly-classified US-Israel projects.

6.  The Plaintiff brought a whistle-blower lawsuit in this Court, Volumetric v Teledyne, USDC Boston 96-10613-REK (1998).  Teledyne president Robert Mehrabian personally retained Boston attorney Natasha Lisman who proceeded to bribe and extort the malpractice of Volumetric attorney, Robert Lawless of Barnstable, MA resulting in sanctions to both attorney and the dismissal of the case on November 10, 1998.

7.  Subsequently during all current relevant periods from 2000 on, prominent Armenian-American Defendant Mehrabian, attorney Defendants Lisman, Schiff, Waterstone, Biden, Harris, Ling and others would conspire to defraud the United States, convert untransmuted Horwitz heirlooms including rare Ukrainian Judaica to Burisma founder Zlochevsky, misappropriate the Plaintiff's trade secrets; aid and abet the Novavax director Michael A. McManus, Jr.'s scheme to cause an international pandemic of SARS-CoV2; and intimidate the Plaintiff by extortion, intimidation including  threats of violence and others violations of his Constitutional Rights.

8. Loyola Marymount Law School, where the 2nd cousin and god-father of one of the Plaintiff's daughters was a senior professor, had featured prominently in the vendetta by California Catholic Chinese-American and Croatian attorneys Joe Ling, Hoover B. Louie, Joseph Mirkovich and Margaret Morrow against the Plaintiff's Aunt and Uncle Dorothy and Walter Horwitz to criminally forge a 'deathbed adumdum' and divert millions of dollars in rare Ukrainian Judaica, art and other assets from the Horwitz Family, Jewish and US Navy charities to ALSAC, other Catholic institutions and themselves, undertaken in part on behalf of a corrupt political alliance between McManus, Patrick E. Malloy III, William and James Rehnquist and Mitt Romney, overseen in Yarmouth, Massachusetts by Douglas Wolf and Herbert, Eileen, Mark, Buffi and Morgan Mordecai.

9. Since 2014, the Plaintiff has regularly communicated and informed Loyola Law School faculty of his concern in these matters.  On February 8, 2015, he formally requested the assistance of California Attorney General Kamala Harris and informed her of McManus' biowarfare schemes.  Harvard Law graduate Defendant Waterstone was a regular invitee at the Obama-Biden White House.  On July 15, 2016, Defendant Biden and Obama endorsed Defendant Harris for Senator over fellow Democrat Loretta Sanchez.

10. On April 19, 2019, the Plaintiff sent an email to current Defendant Michael Waterstone expressing his concern that Defendants had corrupted the Courts, represented a danger to Loyola faculty and that Novavax director Michael A. McManus, Jr. was planning acts of biowarfare.  The email ended with a request for assistance, references and my contact information  *"details may be found in the attached missive to the California AG and at www.horwitzdw.com.  I strongly urge your attention to very serious matter. Sincerely, Dennis J Solomon 508 394 9221 horwitzdw@gmail.com"*

11. Prior to and thereupon Defendant Waterstone and the other Defendants criminally and intentionally conspired and abridged the Plaintiff's Constitution Rights by knowingly and intentionally communicating the falsehood to the Canton, Massachusetts Police that the Plaintiff represented 'an immediate danger to the community' and mandating that Canton Police secretly find and compel the interview of the Plaintiff at 2 AM in the morning on April 20, 2019 following the first Seder of Passover while he was spending the Jewish holiday in the Hebrew SeniorLife apartments  with his 95 year-old Mother.  The Plaintiff's Family had spent the Seder seated immediately adjacent former Massachusetts Governor Michael Dukakis and his extended family, during which they discussed the plans for a concert and documentary reprising the 1942 Jewish National Fund concert which headlined Harry Ellis Dixon, father of Kitty Dukakis, and Cantor Pierre Pinchik, 1st Cousin of the Solomon/Horwitz Family.

12. When Canton Police reported to Yarmouth Police that the Plaintiff was fully cooperatively and did not represent a danger to others or himself, Defendant Fredrickson, police chief of

Yarmouth, waited until Monday, April 22, 2019 and then ordered that the Plaintiff's Massachusetts License To Carry, routinely renewed without incident for the past thirty years, be suspended on the grounds of "unsuitability" by reason of the communication with Loyola Dean Waterstone. Rather to call the Plaintiff on his well-known mobile number, Defendant Fredrickson ordered Canton Police to publicly serve said suspension on the Plaintiff in the afternoon at the Hebrew SeniorLife facility and seize all weapons in the apartment.  Said method of service was solely designed to embarrass and intimidate. However, the Plaintiff's registered firearms were in proper locked storage in Yarmouth. Defendant Fredrickson ordered the Plaintiff to return to Yarmouth and notify the Yarmouth Police after he had retrieved the firearms, to come and collect the firearms.

13.   These Defendants' ulterior motive for the intimidation of the Plaintiff was to intentionally aid and abet the international criminal acts of prominent Catholic Chinese-American attorney Joe Ling, his co-located law partners, Joseph Mirkovich and Margaret Morrow of Long Beach, California; and former Nixon/Ford/Reagan White House counsel Michael A. McManus, Jr. director since 1998 of Novavax, Inc. (NVAX) including the theft and conversion of rare 16th century Ukrainian and Holocaust Judaica and other assets from the Estate of Walter and Dorothy Horwitz, the theft of US-Israel defense technologies, and the preparation and release of the SARS-CoV2 virus in Wuhan, Milan and New York.

14.   On July 21, 2019, the Plaintiff filed a Petition for Judicial Review of the LTC Suspension.  On October 1, 2019, the Barnstable District Court set a hearing date of November 8, 2019. On October 10, 2019 Defendants filed a Motion to Dismiss fraudulently alleging the Petition for Review was untimely.  The Defendants, knowing the Plaintiff was in Canton for the Jewish Holidays, set the Motion Hearing for October 18, 2019 and did not serve the Plaintiff electronically. The motion was granted by default.  Defendants subsequently refused to move to vacate the Motion or re-instate the Plaintiff's LTC.

15.   The coincident and further criminal ongoing acts of the Defendants' conspiracy  include forgery, bribery, perjury, wire and mail fraud, economic espionage, intimidation by threats of violence, violence and murder, unlawful search and seizure of property, accepting bribes and gratuities, obstruction of justice, and fraud on the Courts; and were primarily motivated by personal avarice and religious-bias. These crimes constitute unlawful predicate acts under the 18 USC §1964 and other State Laws.

16.   The Defendants' further unlawful acts and conspiracies deprived Plaintiff while acting under the color of State law of the Rights by secured by the 1st, 2nd, 4th and 7th Amendments the United States Constitution actionable under 18 USC §1983.  The Plaintiff seeks injunctive and declaratory relief and protections to enable his full exercise of his Rights guaranteed by the 1st, 2nd, 4th and 7th Amendments to the Constitution, compensatory and other damages as the Court deems reasonable.

17. For reasons avers herein, it is the Plaintiff's belief and opinion that nearly all of the Intelligence Agencies of countries of the European Union, Israel, Saudi Arabian, Gulf States and Asian Pacific including China, Koreas, Japan, Taiwan have conclusively attributed the SARS-CoV2 pandemic to the McManus Cartel with the complicity of Mitt Romney, Kamala Harris, Joseph Biden, Nancy Pelosi and the Defendants herein. This position is further evidenced by recent papers by asylum Chinese, Harvard-MIT Broad Institute, US Los Alamos Laboratory and European counterparts that the SARS-CoV2 virus did not recently 'jump' to human hosts, and the pattern of dissemination, including 'super-spreader' events including the 10/5/20 'White House' events do not exhibit a natural pattern – i.e. they were artificial assisted'   It is the Plaintiff's belief and opinion said agencies and affiliates are engaged ongoing actions to eliminate all said threats and realize retribution against the perpetrators and their heirs for the deaths and damages inflicted.

## PARTIES

18. Plaintiff Dennis Solomon is a semi-retired scientist of senior age, educated at the Massachusetts Institute of Technology and the Marine Biological Laboratories, Woods Hole, MA.  His foundational discoveries with MIT Professor Eugene Bell contributed to the founding the MBL Bell Center for Regenerative Biology and the biomedical company Organogenesis, Inc. (Nasdaq: ORGO).  His work with Dr. Don Levinstone and later with Prof. Michael Dertouzas created the foundation of the U.S. Defense and Intelligence community's AI analyzed "Lab on the Chip" for the study of toxins and biowarfare agents. His ongoing work relates to the role of Microtubules in Cell Cybernetics and Task Specific VR/AR Hardware and Applications design.  He was raised in Newton, MA and has been a resident of Yarmouth, Massachusetts for the past thirty years, joining his extended family who have been residents over 80 years, including his maternal second cousin, once removed, the late James Horovitz, a graduate of Harvard University who received the Navy Cross for heroism at Iwo Jima.

19. Plaintiff Solomon is a direct descendant of the Ben Veniste and Horowitz sages, and Chaim Weizmann Zionists from the 1800s, as reported in the 1920 archives of the Boston Public Library and the papers of Albert Einstein.  He has been active in Zionist and pro-Israel security affairs since 1972 and serves on the Senior Housing Management Committee of B'NAI B'RITH and other charities.  He received his Bar Mitzvah at Temple Emanuel of Newton, MA.

20. The Defendant, Frank Fredrickson, is believed to a resident of Massachusetts and the Chief of Police for the Town of Yarmouth and is served in his personal and official capacity.

21. The Defendant, Philip Magnuson, is believed to be a resident of Massachusetts and a Police Officer for the Town of Yarmouth and is served in his personal and official capacity.

22. The Defendant, Michael Kennefick, is believed to be a resident of Massachusetts and attorney for the Town of Yarmouth and is served in his personal and official capacity.

23. The co-conspirator, Robert Lawless is believed to be an attorney and a resident of Orleans, with law offices in Barnstable. He is believed to accepted gratuities and other things of value from attorney Lisman to default a whistle-blower case brought by the Plaintiff against Los Angeles-based Teledyne funded by Armenian president Robert Mehrabian.

24. The co-conspirator, Natasha Lisman is believed to a resident of Massachusetts, an attorney and a summer resident of Woods Hole, Massachusetts.  She is believed to have been raised in the Ukraine, attended graduate school at MIT and during the period in question from 2016 to the present, trained Russian and Ukraine lawyers.  She was a neighbor of Robert Mehrabian in the 1970s.

25. The co-conspirator, Douglas Wolf, is believed to be a trademark attorney, resident of Newton, Massachusetts, and summer resident of the Town of Yarmouth.  He aided and abetted Robert Mehrabian in the development of Color Kinetics, Inc. and murder of Paul Miller; the USC Holodeck schemes of Scott Edelman; and Eski/Pixmob schemes of David Parent, Vincent LeClerc and Jeffery Epstein.

26. The co-conspirator, Eileen "Buffi' Mordecai, is believed to be a resident of Hampton, New Hampshire and has been summer resident of the Town of Yarmouth.

27. The Defendant, Michael Waterstone, is believed to a resident of California and Dean of Loyola Marymount Law School of the City of Los Angeles and a graduate of Harvard Law School.  He is served in his personal and official capacity.

28. The Defendant, Michael Moore, is believed to a resident of California and the Chief of Police for the City of Los Angeles and is served in his personal and official capacity.

29. The Defendant, Xavier Becerra, is believed to a resident of California and Attorney General of the State of California. He is served in his personal and official capacity.

30. The Defendant, Kamala Harris, is believed to a resident of California and former Attorney General of the State of California and is served in his personal and official capacity.

31. The Defendant, Douglas Emhoff, is believed to an entertainment attorney and resident of California.  He is Jewish and married to Defendant Kamala Harris.

32.   The Defendant, Adam Schiff, is believed to a resident of California and Congressman for the State of California and a Harvard Law graduate.  He was raised Jewish and married a Catholic. He is served in his personal and official capacity.

33.   The Defendant, Joseph Biden is believed of the Catholic religion, a resident of Delaware and former Vice President of the United States and is served in his personal and official capacity.

34.   The Defendant, Loyola Marymount University of Los Angeles, California is an educational institution including Loyola Marymount Law School empowered and obligated as its request by the State of California and the United States to certify qualified attorneys for the practice of the Laws of the United States.

35.   The Defendant, Harvard University of Cambridge, MA is an educational institution including Harvard Law School empowered and obligated as its request by the State of California and the United States to certify qualified attorneys for the practice of the Laws of the United States.

36.   The Defendant, Maria Stratton, is believed to a resident of California, a jurist on the California Courts, and is served in his personal and official capacity.

37.   The Defendant, Geoffrey Kehlmann, is believed to a resident of California and a graduate of Loyola Law School and Boston College.  He is served in his personal and official capacity.

38.   The Defendant, Elena Sadowsky Kehlmann, is believed to a resident of California and a graduate of Loyola Law School and Boston College.  She is served in his personal and official capacity.

39.   The Defendant, Glenn Kehlmann, is believed to a resident of Newton, Massachusetts and Martha's Vineyard, Raised Jewish.  He is a medical doctor associated with Harvard Medical School and is served in his personal capacity and official capacity.

40.   The Defendant, Barbara Biller, is believed to a resident of Newton, Massachusetts and Martha's Vineyard and Catholic.  She is a medical doctor associated with Harvard Medical School and is served in her personal capacity and official capacity.

41.   The Defendant Anne Egerton is believed to a resident of California, Catholic, a jurist on the California Courts, and is served in his personal and official capacity.

42.   The Defendant, John Shepard Wiley, Jr is believed to a resident of California, a jurist on the California Courts, and is served in his personal and official capacity.

43. The Defendant, Luis A. Lavin is believed to a resident of California, a jurist on the California Courts, and a graduate of Harvard Law School. He is served in his personal and official capacity.

44. The Defendant, Halim Dhanidina is believed to a resident of California, Muslim, a jurist on the California Courts, and is served in his personal and official capacity.

45. The Defendant, Christine A. Snyder is believed to a resident of California, jurist, Catholic and honored by the Armenian Bar Association and is served in her personal and official capacity.

46. The Defendant, R. Gary Klausner is believed to a resident of California, jurist, Catholic and graduate of Loyola Law School. He is served in her personal and official capacity.

47. The Defendants, the Supreme Court of California, represented by Chief Justice Tani Gorre Cantil-Sakauye in her official capacity.

48. The State of California represented by Governor Gavin Newsom in his official capacity.

49. Estate of Joe Ling is believed to be a California Trust and distributions of the late attorney Joe Ling which included over $10 million dollars US in the i untransmuted investments, property, cash, art, Judaica and Horwitz heirlooms of Walter Horwitz.

50. The Defendant, Leigh-Ellen Louie is believed to a resident of California and the niece of the late Long Beach attorney Joe Ling. She is served in his personal capacity.

51. The Defendant, Rose Aparicio, is believed to a resident of California and fiduciary of Dorothy Horwitz. She is served in her personal capacity.

52. The Defendant, Lisa Aparicio, is believed to a resident of California and fiduciary of Dorothy Horwitz. She is served in her personal capacity.

53. The Defendant, Joseph N. Mirkovich, Jr. is believed to a resident of California, a psychiatrist, and the son of the Long Beach attorney Joseph N. Mirkovich. He is served in his personal capacity.

54. The Defendant Vatican Bank IOR is believed to conduct the financial activities of the Catholic Church since 1942 including in California and Massachusetts.

55. The Defendant Catholic Church of America includes the many subdivision and societies including the Society of Jesus (Jesuits).

56. The Defendant Charities listed on the Charities page of the deathbed "Adumdum" to the Dorothy Horwitz Family Trust.

57. The Defendant St Jude / ALSAC listed on the Charities page of the deathbed "Adumdum" to the Dorothy Horwitz Family Trust, believed to be located in Memphis, TN.

58. The Defendant Vincent LeClerc is believed to be a resident of Canada and a former graduate student at MIT funded by the late Jeffery Epstein.

59. The Defendant, David Parent is believed to be a resident of Canada, a former graduate student at MIT funded by the late Jeffery Epstein.

60. The Defendant Denise Casper is believed to be a resident of Massachusetts, a jurist and who accepted gratuities and other things of value from the late Jeffery Epstein to rule in favor of David Parent and Vincent LeClerc, represented by co-conspirator Douglas Wolf.

61. The Defendant USC (University of Southern California) and its division Children's Hospital listed on the Charities page of the deathbed "Adumdum" to the Dorothy Horwitz Family Trust, believed to be located in Los Angeles, California.

62. The Defendants John Doe 1-5 are believed to be residents of California, officers and other employees of the Los Angeles Police Department.

63. The Defendants John Doe 6-10 are believed to be residents of Massachusetts, officers and other employees of the Yarmouth Police Department.

**OTHER RELEVANT CO-CONSPIRATORS & INDIVIDUALS**

64. The co-conspirator, Scott Edelman, is believed to be a resident of California, trademark attorney with Gibson, Dun & Crutcher, and fraudulently used University of Southern California in proceeding before the USPTO while actually representing US Army project director Michael Macedonia.

65. Co-conspirator Robert Mehrabian (1941-) is a prominent Armenian-American and executive chairman of Teledyne, Inc. of Los Angeles, CA.   He holds a PhD from MIT and was a non-tenured associate professor until 1975.  He was president of Carnegie-Mellon University in Pittsburgh from 1990-1997, when he accepted the presidency of Teledyne, Inc.  He was a neighbor of John and Natasha Lisman in Boston.

66. The co-conspirator, Michael A. McManus, Jr. ("McManus") is believed to be a resident of New York with residences in East Hampton, NY and Florida.  He was born in Boston (1943), graduated U of Notre Dame and Georgetown Law School (1967) and served as a US Army JAG at Ft. McNair, Washington, D.C.  In  He has had special relations with China and its security services since his role coordinating President Reagan's April 1984 trip to China.  In 2003, McManus was NOT cleared to attend the screening of SEA BISCUIT at the Bush White House.

## STATEMENT OF FACTS

67.   From the 1940s to the present, members of the Solomon/Horwitz Family including the Plaintiff's Uncle and Aunt Walter and Dorothy Horwitz, his Parents and the Plaintiff have participated in the recovery of stolen Holocaust Judaica, Art and assets and search for Nazi war criminals and collaborators.  The specific acts of the Plaintiff's Boston-born Uncle Walter uncovered the complicity of the Catholic Church in unlawful concealment and conversion of hundreds of millions of dollars and many Croatian Catholic war criminals secretly settled in Long Beach, California.

68.   The success of Walter Horwitz 's contributions caused ALSAC (American Lebanese Syrian Associated Charities), the Catholic Church and other institutions to repatriate tens of millions of dollars US.  Since 1997, Michael A. McManus, Jr., Defendant Leigh-Ellen Louie, her Uncle Joe Ling and others have conspired a revenge against Dorothy and Walter Horwitz.

69.   During the Fall of 2013, prominent Catholic Chinese-American attorney Joe Ling, his co-located law partners, Joseph Mirkovich and Margaret Morrow of Long Beach, California executed an egregious hate crime involving the murder of Dorothy Horwitz, the forgery of a "deathbed adumdum" to the Horwitz Family Trust and the partially theft of ten of millions of dollars in rare Ukrainian and Holocaust Judaica, Art and other Trust assets.

70.   Subsequent investigations and California litigation has been complex and is ongoing, involving legal scholars, jurists, politicians, the Jewish Agency and others; further complicated by indictment by the People's Republic of China of Michael A. McManus, Jr. for bribery in his biomedical industry dealing and his involvement as director of Novavax, Inc. (NVAX) since 1998 in the SARS-CoV2 pandemic in Wuhan, Milan and New York.

71.   The present case involves events directly related to the aforementioned conspiracies which occurred in the State of Massachusetts during the past two years.

### RELEVANT FACTS: ACTS OF DEFENDANTS FREDRICKSON, MAGNUSON & KENNEFICK

72.   On April 19, 2019, the first night of Jewish holiday of Passover, the Plaintiff Dennis J Solomon joined his 95 year-old Mother in Canton, and spent part of a very pleasant evening seder discussing plans with the extended Dukakis/Ellis family including the former Governor, for a documentary film and concert reprising the famous 1942 Jewish National Fund Boston Concert headlining Harry Ellis Dickson, father of Kitty Dukakis and the Plaintiff's first cousin, twice removed, the renowned Cantor Pierre Pinchik educated in Odessa, Ukraine.

73.   Later that night at approximately 2 AM, April 20, 2019, Canton Police Officer Moriarty ring the doorbell at Plaintiff's Mother apartment in Canton, to investigate and interrogate the

Plaintiff regarding an alert of immediate threat to the community received from Frank Fredrickson, chief of police of the small Cape Cod town of Yarmouth related to an email the Plaintiff sent the previous day to Michael Waterstone, Dean of Loyola Marymount Law School and a graduate of Harvard Law.  The Email requested Dean Waterstone's assistance regarding the theft and conversion of Horwitz and Pinchik rare Ukrainian Judaica by a criminal conspiracy under the auspices of Michael A. McManus, Jr.  It further informed that McManus was believed to have eliminated former co-conspirators and adversaries.

74.   After a 20-30 minute conversation with the Plaintiff, Officer Moriarty concluded that the Plaintiff did not represent an immediate threat to community or himself.  He reported his findings to the Yarmouth Police Department.

75.   On the sole basis of the Waterstone Email and with the knowledge of the conclusions of Officer Moriarty that the Plaintiff did not represent an immediate threat On April 22, 2019, Defendant Fredrickson suspended the Plaintiff's Massachusetts License to Carry Firearms which he had held without incident for thirty years, under the 'unsuitability' clause.

76.   On April 22, 2019,  Defendant Fredrickson faxed a formal order to the Canton Police that they seize the Plaintiff's LTC and all of the Plaintiff's firearms where upon Canton Officers Galanis and Yeaton presented themselves at the Canton apartment of the Plaintiff's Mother and served the order.

77.   The Plaintiff informed the Canton Officers that neither his LTC nor his weapons were on the premises.  With subsequent discussions with Yarmouth Police, the Plaintiff retrieved his weapons and surrendered them in the days following including to Yarmouth Police dispatched to the Plaintiff's location.

78.   On Sunday, July 21, 2019, the Plaintiff e-filed a Petition to Judicial Review of the Suspension which was stamped on Monday, July 22, 2019.  Defendant Fredrickson was served shortly thereafter.

79.   On October 1, 2019, the Barnstable District Court issued a Notice of Hearing for Judicial Review of the Suspension for November 8, 2019.

80.   In 2019, the Jewish High Holidays ran from Rosh Hashana on September 29 to October 20.  It had been customary, and Defendant Fredrickson was aware that the Plaintiff would be visiting his Mother in Canton during this period and would not receive postal mail delivered in Yarmouth.

81.   On October 10, 2019, Defendants Fredrickson, Magnuson and attorney Kennefick filed a Motion to Dismiss noticing a hearing date of October 18, 2019 misleading the Court by alleging that the 90-day period to Petition for Review had expired and thus the Petition untimely.

82. The Defendants intentionally did not serve the Plaintiff electronically but only by U.S Postal Mail, knowing the Plaintiff would not receive notice of the October 18 hearing until at least October 20, 2019.

83. The Defendants attended the October 18, 2019 and moved for a dismissal of the Petition for Review by default. The motion was granted.

84. As of January 31, 2020, the Defendants have refused to voluntary withdraw the default judgement and permit judicial review.

**RELEVANT FACTS: THE ZIONIST & JEWISH FAMILY BACKGROUND OF THE PLAINTIFF**

85. The Plaintiff is descendant of historic Jewish Ben Veniste and Horowitz Families including the late Isaiah Horowitz (1555-1630) who is interred in Israel in the Garden of Maimonides. Members of the close Horowitz Family arrived in the United States in the mid-1800s, together with the Europe members have participated in the World Zionist movement since its inception in the 1800s, accompanied Chaim Weizmann and Albert Einstein on their first visit to the United States in 1921 and on the US Weizmann Mission to Jerusalem in 1928. Related articles are in the archives of the Boston Public Library.

86. The Plaintiff's immediate Horowitz family including the noted Cantor Pierre Pinchik arrived from the Ukraine in 1922 and settled into the West End of Boston.

87. Cantor Pinchik established a close friendship with Harry Ellis Dixon and the Khousseviskys. Together, they headlined many WWII charity concerts including a famous 1942 concert in Boston with Harry Ellis Dixon.

88. Many members of the Great-Generation of the Plaintiff's Family served the US and Allies in WWII including his Boston-born Father (US Navy Aviation), 2nd cousin James Horovitz of Yarmouth (grad Harvard, US Navy, awarded Navy Cross at Iwo Jima), Henry Hurwitz, Jr. (Manhattan Project) and Dr. Uffe Horwitz (Denmark, Underground).

89. After WWII, many participated in the founding of the State of Israel, including the Plaintiff's parents who joined with TWA crewmember Al Schwimmer and founded the Israel Air Force. In 1984-5, McManus schemed to entrap Al Schwimmer and the Plaintiff's Father in Iran/Contra.

90. The Plaintiff continued the tradition. Following the Munich Olympic Massacre of 1972, the Plaintiff, a student at Massachusetts Institute of Technology was invited and joined a "working group' under the auspices of MIT Professor Louis Smullin, chair of EE & CS, which provided technical assistance to US, Israel and international organizations investigating and defending against said terrorist attacks.

91. Since then the Plaintiff's adversaries have repeatedly accused and schemed to entrap the Plaintiff as an agent of Israel.

**RELEVANT FACTS: ATLANTIS WEATHERGEAR & MICHAEL A. MCMANUS, JR.**

92.  From 1973 to 1974, the Plaintiff was a design consultant to Hood Sailmakers of Marblehead, MA. During the same period, he designed and founded Atlantis Weathergear ("Atlantis") which received acclaim at the 1974 America's Cup in Newport, Rhode Island, won by Courageous skipper, Ted Hood.   Atlantis was a Massachusetts corporation, manufactured in Somerville, Massachusetts with offices in Waitsfield, Vermont.

93.  Susan Mordecai of Newton, MA., older sister of Mark Mordecai of Atlantis, had been participating the marijuana trade at the legendary 1969 Woodstock Festival following which she moved to Miami where as a waitress at the popular Miami Marina Restaurant she liaised fashionable parties in the recreational drug trade. In 1973, she introduced the Atlantis principles to a privileged Canadian entourage which include 'Maggie' Trudeau, then the young wife and current mother of the Prime Ministers.

94.  Commencing in 1974, the vice-president of Atlantis, Eileen "Buffi" Mordecai, established close ties with historic Sugarbush Bistro "Chez Henri", the legendary elite conduit of cocaine from Montreal to Manhattan and the Hamptons.  Mordecai facilitated the use of the Atlantis network for the distribution of cocaine to the elite yacht clubs and nightclubs.

95.  In 1975, Mark and Eileen "Buffi" Mordecai conspired with Patrick E. Malloy III and Michael A. McManus, Jr. to defraud the founding shareholders of Atlantis Weathergear, Inc, including the Plaintiff and gain control of Atlantis at a special meeting to elect new officers. Malloy companion attorney Barbara Salken attended.

96.  Litigation followed with the Plaintiff's represented by former Vermont Attorney General Kimberly Cheney (Cheney, Brock & Sidel) and expert witness MIT Prof. Michael van Breda. Malloy (McManus, Mordecai) were represented by Robert Rachlin.  Prior to the trial, McManus had befriended the Justice Rehnquist & family who had recently purchased a summer home in Vermont.  In 1978, Defendants moved the Company to the Malloy Waterfront (Sag Harbor) in the Hamptons of New York.

97.  In 1981, the Vermont Trial Court, deciding in favor of the Shareholders and Plaintiff, and found the scheme 'displayed itself as a badge of fraud".

98.  In 1982, the Atlantis executives persuaded Massachusetts attorney Maria Lopez to aggressively purchase the Solomon Family home in Newton, MA. Judge Lopez would later marry Stephen Mindich; be forced to resign after Cardinal Law refused offer political support for her 'lenient' decision in a gay prostitute child rape case; prompting Mindich to turn over the extensive dossier on child abuse to the Boston Globe; and her unsuccessful attempt in Hollywood to become Judge Maria.

**RELEVANT FACTS: SAG HARBOR, VERMONT, YONKERS, LOIUE & WTC TERRORISTS**

99.   The Altman Family of Yonkers, NY, owners of Altman Stage Lighting, were avid skiers and owned a ski home in Waitsfield, Vermont (Sugarbush) and summer home in the Hamptons (Montauk).  They were patrons of Chez Henri's and family members shared financial and political interests with Malloy and McManus.

100.  Altman Stage supplied stage and lighting equipment to the fashionable nightclubs in Manhattan and Hamptons, including Studio 54, Malloy's Bay Street managed by Preston Powell Jr. in the Hamptons which they frequented.

101.  From 1983, Altman Stage supplied stage and lighting equipment to number of popular entertainment venues within hotel complexes such as the Holiday Inn, owned or funded by Lebanese financiers and real estate companies.

102.  These venues served as distribution points for Lebanese and later Afghan hashish and heroin imported by affiliates of McManus and Atlantis including Sidney Marvin Lewis of Falmouth, Cape Cod and Stuart Newton and Thomas Gilbert of Providence, RI. US v Newton, Gilbert, 891 F.2d 944 (1989).

103.  Among the venues on the 'circuit' was the Compass Lounge of Yarmouth, MA.  As young summer Yarmouth police officer and Defendant Fredrickson was assigned and later chose the Compass Lounge assignment, where he developed the knowledge and established friendships of the major recreational drug suppliers to the elite summer residents.

104.  The Plaintiff had a long-standing interest in theatre and stage audio, projection and lighting technologies, influenced in part by Jerome Weisner, EE and president of MIT, and his friendship with folk singer Pete Seeger.  In the 1980s, the Plaintiff developed and presented innovate special audio and lighting effects in popular venues.

105.  In 1985, Altman licensed the Plaintiff's inventions and retained him as a consultant.  He would frequently travel to Yonkers and was advised by Altman to use Yonkers station owned by Lebanese-Palestinian Mohammed Saleh, a participant in the 1993 World Trade Center Terrorist Attack.

106.  In 1988, McManus conspired with Elle Altman and others to transfer the Plaintiff's licensed trade secrets to and induce Bran Ferren to fraudulently file a U.S. Patent disclosing said innovations for robotic beam direction optical systems applicable to theatrical lights and other uses.

107.  Dr. Aafia Siddiqui transferred to MIT in 1992 and would network with the radical Islamic Faruq Mosque in Brooklyn. She supported the 1993 WTC bombing.  The Plaintiff was part of team in Boston who monitored her activities.

108. In 1996, she enrolled in the PhD program at Brandeis University where Prof. John Lisman, Defendant Lisman's husband, was one of her advisors.

109. On at least three occasions during the 1990s, including a meeting in Yarmouth, the Plaintiff advised the FBI of the dangerous between McManus, Atlantis, Altman and their corrupt enterprises, the Yonkers WTC bomber and Aafia Siddiqui.

110. On or about 1995, McManus, Macedonia, Altman and other co-conspirators became aware of the Plaintiff's innovative projects with the U.S. Navy NOSC lab in San Diego and Californian film studios including Disney. A number of these projects were staged with the Plaintiff's Aunt and Uncle Dorothy and Walter Horwitz.

111. In a further scheme to obtain the Plaintiff's trade secrets, on or about 1997 McManus induced Disney Imagineering and Bran Ferren to hire Leigh-Ellen Louie, the daughter of Hoover B. Louie, the CPA co-worker of Dorothy Horwitz.

**RELEVANT FACTS: LISMAN, ARMENIAN-AMERICAN ROBERT MEHRABIAN, SCHIFF & USC**

112. During the early 1990s, the Teledyne Corporation of Los Angeles was a subcontractor to an USAF-MIT project directed by and developing the technologies of the Plaintiff for C4I including the remote surveillance and the elimination of time-sensitive targets by robotic weaponry. LCS Director Michael Dertouzas contributed significantly.

113. In the mid-1990s, it became clear that Teledyne, now controlled in Pittsburg (Allegheny Teledyne), was intentionally sabotaging the project by supplying substandard components. The LED division of Teledyne was also in competition with MIT EE Paul Miller, a world expert in the field of visual LED technologies.

114. In 1997, Robert Mehrabian would assist George Mueller and Ihor Lys in founding Color Kinetics, Inc. which had purloined the technologies of Paul Miller. Defendant Wolf would assist and benefit with the intellectual property

115. On November 10, 1998 in <u>Volumetric v Teledyne</u> USDC Boston 96-10613-REK, attorneys Natasha Lisman and Robert Lawless intentionally and jointly sabotaged a whistle-blowers lawsuit for the personal benefit of Teledyne president Robert Mehrabian.

116. At the time, Teledyne's largest customer, the U.S. Army was formalizing the creation of the $100 million dollar University Affiliated Research Center (UARC) at nearby USC. Among the first projects was to usurp with the assistance of Teledyne, the Plaintiff's inventions marketed under Holodeck trademark which were undergoing testing in Yarmouth, MA. On April 14, 2000, Solomon Trust "Holodeck" application entered the publication phase.

117. On or about April 18, 2000, Defendant Wolf solicited the intellectual property business of the Plaintiff during the Passover holidays at Temple Emanuel, Newton, MA. Wolf would explain he was specialist in trademarks and assign the tasks to his associate Carole Boelitz,

a USAF Academy and Harvard Law graduate in hopes of gaining access to the Holodeck Defense technologies, especially the Plaintiff's joint US-Israel projects.

118. Shortly thereafter, the Plaintiff received a communication from GDC attorney Scott Edelman threatening USC opposition to the Holodeck trademark unless USC was licensed and given the right to establish a 'secondary meaning'.   Negotiations over the 'secondary meaning' clause were unsuccessful, and USC filed a formal opposition on July 27, 2000.

119. In May of 2005, Paul Miller MIT EE and legendary Yale professor George Izenour filed affidavits in Color Kinetic v SV International, USDC Boston 02cv11137-MEL challenging the Defendant Wolf – Color Kinetics patents and technology.   This challenge blocked the planned sale of Color Kinetics for $791 million dollars, and substantial profit for Defendant Wolf and Robert Mehrabian.

120. On November 5, 2005, Paul Miller passed away unexpectedly at 55 of a heart attack at the new Pittsburgh Convention Center.  He was installing a $1 million Art and Information installation competitive to Color Kinetics.  The sale of Color Kinetics to Philip Corporation closed a year later.

121. During the mid-late 2000s, USC, Edelman, Macedonia, McManus, Mehrabian, and Teledyne unlawfully schemed and conspired to influence and bribe the USPTO and abuse the discover process of trademark opposition to obtain detailed US-Israel defense technology and trade secrets. Their unsuccessful schemes cost USC out of pocket costs of at least $750,000.

### RELEVANT FACTS: LISMAN, WOLF, PIXMOB, SCHIFF, HARRIS, PELOSI & BIDEN

122. In 2009, Defendant Lisman and her late husband Brandeis Prof. John Lisman were the key proponents of closing the Rose Art Museum and selling its nearly billion-dollar collection. Prior to approval, Lisman ordered key works to be crated for shipment to her Russian and Ukrainian oligarch clients.   At the same time, the McManus and the Obama State Department requested Lisman's assistance in recruiting Tamerlan Tsarnaev through the Raphael Teken network at Brandeis to sabotage Russian suppression of Islamic radicalism.

123. Beginning on or about 2011, Defendants Wolf, Teledyne, Edelman, Parent and  LeClerc conspired  in a scheme of fraud, espionage and bribery, funded by the late Jeffery Epstein and promoted by MIT Media Lab directors Joichi Ito and Nicolas Negroponte, to unlawfully expropriate the Plaintiff innovative trade secret technologies and bribe the U.S Patent Office to obstruct the prosecution of the Plaintiff's earlier-filed application #13294011 – "PIXMOB" scheme.

124. In furtherance of their corrupt enterprise, Defendant Wolf and Lisman engaged Mehrabian and his personal network including Defendant Adam Schiff, John Negroponte, John Kerry,

Robert Mueller and James Rehnquist.   In 2012, a scheme evolved to use the "PIXMOB" devices to disrupt the Sochi Olympics in coordination with Islamic terrorism facilitated by Tsarnaev.   When Tsarnaev refused to participate, he was visited by two Massachusetts State Troopers who advised him that "they would be pinning the Brandeis murders (Mess, Weissman, Teken) on him.   Thereafter, Tsarnaev commenced preparations to the Boston Marathon Bombings of 2013.

125.  Under the direction of the USOC director McManus, the Plaintiff's purloined technology was used by PIXMOB for the Olympic Medallions at the January 2014 Sochi Olympics.

126.  The Obama/Kerry/Mueller/Romney/Lisman scheme to disrupt the Sochi Olympics was also uncovered by Russian president Putin.  Shortly after the Sochi Olympics, Putin sanctioned the secession of Crimea from the Ukraine and its annexation by Russia.

127.  Defendant Schiff was routinely advised of the Plaintiff's observations and opinions which extended from his maternal ancestry in the Ukraine, his frequent visits to "Little Odessa" beginning in the 1980s, his personal friendship with Carol Eberhart from Woods Hole, MA who represented the US in the G7 project to entomb the Chernobyl nuclear reactor and as Deputy Director General of the NEA, Paris, France, long-standing knowledge of Dartmouth graduate Leonid Vindman, and many biomedical and other contacts with the Ukraine.

128.  Following the death of Dorothy Horwitz, the Plaintiff contacted and requested the assistance of Defendant Schiff and Defendant Pelosi regarding her murder, the corruption of California authorities and the local FBI, and the theft of rare Judaica.  Defendant Schiff refused to provide assistance.

129.  Simultaneously, Defendant Lisman was conspiring with Defendant Ling to sell the purloined the Ukraine Judaica to Ukrainian oligarchs including Mykola Zlochevsky, founder of Burisma.

130.  From 2015 and thereafter, Defendants Schiff, Pelosi, Biden and Harris intentionally obstructed the FBI and other authorities from investigating the Plaintiff's request and averment that Defendant attorney Ling, Morrow and Mirkovich conspired with Defendant Stratton, suborned the perjury of notary Doris Tucker and intentionally submitted as true forged Trust documents constituting 'fraud on the court."

131.  In 2016 and thereafter, Defendants Schiff, Pelosi, Biden and Harris intentionally and for personal gain and purpose, concealed, obstructed, aided and abetted after the fact, Burisma oligarch Zlochevsky financed the theft of rare Judaica and Horwitz heirlooms in order to protect the unlawful activities and payments to Paul Pelosi Jr. and Hunter Biden.

132.  From 2015 and thereafter, Defendants Schiff, Pelosi, Biden and Harris intentionally and for personal gain and purpose, concealed, obstructed, aided and abetted after the fact, the

murder of Dorothy Horwitz, the theft of the Horwitz Estate, the corruption, coercion and extortion of California and Federal authorities by influencing Massachusetts, California and Federal not to investigate the averments of the Plaintiffs, when they in fact knew that said averments were accurate and true.

133. Said unlawful acts constitute a violation of 18 U.S. Code § 4, Misprision of a Felony, which the Defendants as members of the Bar individually, and in their official capacity had an affirmative duty.

**RELEVANT FACTS: ATTORNEY JOE LING, MICHAEL MCMANUS, BIDEN, SARS-COV AND PRC CHINA**

134. McManus has had special relations with China and its security services since his White House role coordinating President Reagan's April 1984 trip to China.

135. Defendant Biden also has a special relationship through the frequent trips of his son, Hunter Biden and Chinese firm BHR which was formed in November 2013 by a merger between the Chinese government linked firm Bohai Capital and a company named Rosemont Seneca Partners. Rosemont Seneca was formed in 2009 by Hunter Biden, the son of then Vice President Joe Biden, by Chris Heinz, the stepson of former Secretary of State John Kerry, Devon Archer and others.

136. In 1995, McManus was elected a director of the U.S. Olympic Committee (USOC).

137. In 1998, McManus, as president of Misonix (MSON) and director of Novavax(NVAX) initiated biomedical business with PRC China.

138. In February of 2003, the SARS-CoV 2003 pandemic presented a severe form of pneumonia, accompanied by a fever. The World Health Organization (WHO) in 2004 reported that the pandemic cause 774 deaths over the six-month period.

139. In 2004, Novavax, Inc. received a three-year contract from the National Institutes of Health (NIH) to develop a Severe Acute Respiratory Syndrome (SARS) vaccine using its proprietary Virus Like Particle (VLP) technology.

140. As early as April 2011, Novavax and Utah State University had produced protective VLPs against the SARS-CoV virus.[1]  The study was published in the journal Vaccine (online 14 July 2011).

141. In 2013, Novavax, Inc. announced today that it had successfully produced a vaccine candidate designed to provide protection against the recently emerging Middle East Respiratory Syndrome Coronavirus (MERS-CoV) which is part of the coronavirus family that includes the severe acute respiratory syndrome coronavirus (SARS-CoV).

---

[1] https://www.sciencedirect.com/science/article/pii/S0264410X1101005X

142. In January of 2014, Novavax and U of Maryland published the results of their experimental vaccine which produced an immune response to MERS-CoV and SARS-CoV, using their proprietary nanoparticle platform and mice as the model.[2]

143. On February 8, 2015 and periodically thereafter, the Plaintiff formally advised California Attorney General Kamala Harris of evidence that McManus was planning a bio-terrorist event similar to 9/11 Anthrax (5 deaths) or 2003 SARS-CoV (774 deaths).

144. On Aug. 23, 2017 Novavax announced that data from a preclinical study of its nanoparticle influenza vaccine candidate with its proprietary Matrix-M™ adjuvant (NanoFlu™) have been published in the journal Vaccine. The study, conducted in ferrets, found that NanoFlu induced antibodies against a broad range of influenza subtypes.

145. By 2018, Novavax realized that its NanoFlu vaccine could be effective against SARS, especially in an elderly population. Concurrently, beginning in early 2018, international Intelligence community noted that McManus was engaging in dangerous activities to protect the Catholic Chinese and Chinese-Americans who had been part of his Chinese criminal network which resulted in his resignation from Misonix in 2016.

146. On January 03, 2019 Novavax announced top-line results of its Phase 2 clinical trial of NanoFlu™. The trial compared the safety and immune responses of NanoFlu with two U.S.-licensed influenza vaccines in 1,375 healthy adults 65 years of age and older. Despite the announcement, during February 2020, Novavax stock declined 70%.

147. On May 10, 2019, Novavax was forced to issue a one-for-twenty reverse stock split to maintain Nasdaq listing. It reported a -$184,000,000 loss for 2018. It had lost over $1.2 billion dollars and equity was -$167 million in the hole. With a quarterly burn-rate of $40,000,000 its $120 million in all current assets in December 2018, it was disappearing quickly. The year 2019 would be dismal and likely its last.

148. By the Fall of 2019, McManus and El-Hibri put in place personal financial and other structured protocols for the sale of their respective stock holdings beginning in late winter of 2019.

149. During the same period, most authorities believe the SARs-CoV2 first appeared in the human population in the countryside close to Wuhan, China.

150. In mid-November 2019, McManus sold a minimum amount of his Novavax stock to trigger a Form 4 Insider Trade at its lowest price of $3.82. He remained a major equity insider through options and other agreements.

151. By January 24, 2020, Novavax had defined its corporate strategy for COVID19  and by January 27, 2020, its stock surged after announcing it was working on a COVID19 vaccine.

---

[2] https://www.sciencedaily.com/releases/2014/04/140430112247.htm

152. However, when China successfully halted the SARS-CoV pandemic in late February, Novavax stock languished. In early March, this changed with the emergence of a virulent strain appeared in Boston, New York City and Milan, Italy.

153. On March 10, 2020, El-Hibri's Emergent BioSolutions contracted with Novavax to manufacture their COVID19 vaccine. Emergent's stock steadily surged from $49 to $89 and El-Hibri began automatic weekly sales of 20,000 (~$1,200,000) shares.

154. Since McManus miniscule diversionary sale in November 2019, NVAX has soared to $189 on August 10, 2020, an increase of over 5300% - its capitalization from $200 million to nearly $ 10 billion. It has received over $2 billion in funding from the US and other governments and institutions.

155. On September 9, 2020, Boston Magazine discussed the Harvard-MIT Broad Institute scientist Dr. Alina Chan article which strongly suggests that SARS-CoV2 evidenced a controlled human evolution characteristic of a laboratory mutant. See https://www.bostonmagazine.com/news/2020/09/09/alina-chan-broad-institute-coronavirus/

156. On September 15, 2020, Dr. Li-Meng Yan of Hong Kong School of Public Health published a well-researched paper that the SARS-CoV2 virus was from Chinese labs. This fits with the unpublished Harvard and NAS research difference between the San Francisco and New York strains could not have resulted be natural evolution.

157. Moreover, the unexpected deaths of nearly a dozen or so Chinese physicians and scientists including Wuhan ophthalmologist Dr. Li Wenliang who notify San Francisco and US counterparts in January 2020 suggests their involvement in the SARS-CoV2 virus and Chinese action.

158. Among those with detailed knowledge are Joe Biden, Kamala Harris, Adam Schiff, Nancy Pelosi and Diane Feinstein who are intentionally defrauding and endangering the American people by interfering with a full investigation of the findings of Drs. Chan, Yan and others that SARS-CoV2 is being disseminated intentionally including at "super-spreader" events such among the White House attendees introducing jurist Amy Barrett on October 5, 2020.

**RELEVANT FACTS RELATED TO KAMALA HARRIS**

159. On February 8, 2015, this Plaintiff formally requested the assistance of California Attorney General Kamala Harris by documented fax regarding the murder by overdose of prescription opioids of his elderly Aunt Dorothy Horwitz; the forgery of a 'deathbed adumdum' to her formal 2012 Horwitz Family Trust; and embezzlement of said Trust assets including priceless Horwitz and Ukrainian Judaica valued in excess of $7 million

dollars by her successor-trustee's brother-in-law corrupt Catholic Chinese-American attorney Joe Ling and associates.

160. The request also expressed the Plaintiff's belief that the aforementioned acts were sanctioned and protected by the corrupt enterprise of Boston-born, Nixon/Ford/Reagan White House attorney Michael A. McManus, Jr., a former vice-president of Pfizer and, since 1998 a director of Novavax (NVAX) whose activities included 'biowarfare experiments". At the time, Novavax held been experimenting with the 2003 SARS-CoV virus since 2004, and McManus recently commenced unlawful biomedical corporate schemes against his mainland Chinese business partners, including those based in Wuhan. The Plaintiff's correspondence concludes with the opinion that "it is highly likely that a great tragedy involving innocent Californians is in the works."

161. Attorney General Kamala Harris responded and advised contacting the Detective's Bureau of the Los Angeles Police Department.  Despite conclusive evidence that the 'deathbed adumdum' was not signed during Dorothy's lifetime, the LAPD refused to investigate.

162. A further request was made to her husband, <u>Jewish Douglas Emhoff, who would easily recognize that it was near impossible that a elderly Jewish woman with a JNF "Blue Box" and Menorah on her kitchen counter would bequeath priceless Judaica to Catholic Charities.</u>

163. No further response was received from either.

164.

## PERTINENT CONSTITUTIONAL PROVISIONS

165. The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

166. The Second Amendment to the United States Constitution provides:

"A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed" and guarantee[s]  the individual right to possess and carry weapons in case of confrontation."

167. In <u>District of Columbia v. Heller</u>, 554 U.S. 570, 592 (2008) the US Supreme Court made clear that the  2nd Amendment "elevates above all other interests the right of law abiding, responsible citizens to use arms in defense of hearth and home." Id at 635.

168. The Second Amendment is fully applicable to the States thought the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 750 (2010); id. at 805 (Thomas, J., concurring).

169. The Fourteenth Amendment to the United States Constitution provides in pertinent part:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

## PRIOR PROCEEDINGS

170. The Plaintiff received the present License to Carry Firearms, Class A, thirty years ago in 1989.

171. Since then, there have been no incidents of any sort which would call into question the 'suitability' of plaintiff Solomon and represent a 'threat to the safety of the community or himself.

172. It has been routinely renewed.

173. On or about April 22, 2019, the Plaintiff received Notice of Suspension of LTC based on the Communication to Loyola Law School Dean.  He contacted Yarmouth Police and followed all instructions regarding the surrender of firearms and ammunition.  (See Exhibit 1.)

174. On Sunday, July 21, 2019, the Plaintiff e-filed a Petition to Judicial Review of the Suspension which was stamped on Monday, July 22, 2019.  Defendant Fredrickson was served shortly thereafter.

175. On October 1, 2019, the Barnstable District Court issued a Notice of Hearing for November 8, 2019.

176. Aware that the Plaintiff would not receive postal mail during the Jewish High Holiday Period from September 29 to October 20, 2019, the Defendants Fredrickson, Magnuson and attorney Kennefick filed a Motion to Dismiss on false grounds on October 10, 2019 noticing a hearing date of October 18, 2019.  Consequently, the Plaintiff did not appear and the Defendants granted a decision by default.

## COUNT ONE

## VIOLATIONS OF RIGHTS SECURED BY THE PETITION CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

177.  Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

178.  The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

179.  The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Petition Clause of the First Amendment to the United States Constitution.

180.  On October 1, 2019, the Barnstable District Court issued a Notice of Hearing for Judicial Review of the Suspension for November 8, 2019.

181.  In 2019, the Jewish High Holidays ran from Rosh Hashana on September 29 to October 20. It had been customary, and Defendant Fredrickson was aware that the Plaintiff would be visiting his Mother in Canton during this period and would not receive postal mail delivered in Yarmouth.

182.  On October 10, 2019, Defendants Fredrickson, Magnuson and attorney Kennefick filed a Motion to Dismiss noticing a hearing date of October 18, 2019 misleading the Court by alleging that the 90-day period to Petition for Review had expired and thus the Petition untimely.

183.  The Defendants intentionally did not serve the Plaintiff electronically but only by U.S Postal Mail, knowing the Plaintiff would not receive notice of the October 18 hearing until at least October 20, 2019.

184.  The Defendants attended the October 18, 2019 and moved for a dismissal of the Petition for Review by default.  The motion was granted.

185.  The Defendants' Motion to Dismiss was filed solely for unlawful purposes to thwart and delay judicial review and further intimidate the Plaintiff.

186.  The Defendants' acts were in retaliation for the Plaintiff's exercise of his civil rights secured by the Petition and Free Exercise Clause of the First Amendment and the 2nd Amendment to United States Constitution, specifically developing and maintaining his firearm skills to defend himself, his family and community, and petitioning the Massachusetts and California State authority for a redress of his grievances.

187. Defendant Town of Yarmouth has intentionally refused and failed to exercise its proper supervision of its agents and employees to mitigate and prevent further transgressions and violations.

188. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, in violation of the Massachusetts Rules of Professional Conduct and in gross and reckless disregard of Plaintiff's Constitutional Rights.

189. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT TWO

## VIOLATIONS OF RIGHTS SECURED BY SECOND AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

190. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

191. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

192. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Second Amendment to the United States Constitution.

193. On April 22, 2019, Defendant Fredrickson suspended the Plaintiff's LTC based on M.G.L. 140 § 131, which reads: [may suspend a license issued] "if, in a reasonable exercise of discretion, the licensing authority determines that the licensee is unsuitable ... A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that the applicant or licensee may create a risk to public safety;"

194. On April 22, 2019, Defendant Fredrickson had received the report of Canton Police Officer Moriarty who had interviewed the Plaintiff in person at 2 AM in the morning of April 20, 2019 and found that the Plaintiff did not exhibit behavior that he posed a risk to public safety.

195. On April 22, 2019 Defendant Fredrickson lacked any "reliable and credible Information that the Plaintiff exhibit a risk to public safety."

196. Defendant Fredrickson's suspension of the Plaintiff's LTC was solely biased on the Defendant's religious bias against the Plaintiff for petitioning California authorities for a

redress of his averments that Defendants Waterstone and Moore were obstructing the investigation enter the theft of more than $100 million dollar US by the Catholic Church and ALSAC.

197. The Defendants' acts were a key part of an interstate conspiracy in retaliation for the Plaintiff's exercise of his civil rights secured by the Petition and Free Exercise Clause of the First Amendment and the 2nd Amendment to United States Constitution, specifically developing and maintaining his firearm skills to defend himself, his family and community, and petitioning the Massachusetts and California State authorities for a redress of his grievances including the theft of priceless Judaica and other assets of the Horwitz Family Trust and Walter Horwitz.

198. Defendant Town of Yarmouth has intentional refused and failed to exercise its proper supervision of its agents and employees to mitigate and prevent further transgressions and violations.

199. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT THREE

## VIOLATIONS OF RIGHTS SECURED BY THE FOURTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

200. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

201. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

202. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Four Amendment to the United States Constitution to be free from unreasonable searches and seizures.

203. The Defendant Fredrickson, on April 19, 2020 order the unreasonable search of the Plaintiff by Canton Police where a preliminary telephone call would have sufficient.

204. The Defendant Fredrickson having learned the Plaintiff poses no threat to even a mouse, on April 22, 2020 order two Canton Police officers to conduct an unreasonable search and seizure of the Plaintiff's firearms without the courtesy of a phone call to mitigate the situation.

205. Over the next few days, Defendant Fredrickson and accomplices compelled without judicial warrant the Plaintiff to permit the Canton and Yarmouth Officers under their command to search and seize the Plaintiff's firearms. The Plaintiff objected but complied with the orders of the police. The Defendants unlawfully seized the Plaintiff's firearms, ammunition, cases and locks, and continue to deprive the Plaintiff of their use.

206. The Defendant Fredrickson, Magnuson, Kennefick and John Doe's acts were in retaliation for the Plaintiff's exercise of his civil rights secured by the Free Exercise Clause of the First Amendment to United States Constitution, specifically his expression of his religious belief in concordance with the Balfour Declaration, that the Jewish tribes (the State of Israel) are sovereign over the lands west of the Jordan River from Eilat to Golan, including the Temple Mount.

207. Defendant Town of Yarmouth has intentional refused and failed to exercise its proper supervision of its agents and employees to mitigate and prevent further transgressions and violations.

208. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, and in gross and reckless disregard of Plaintiff's Constitutional Rights.

209. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

210. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT FOUR

### VIOLATIONS OF RIGHTS SECURED BY THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

211. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

212. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

213. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Free Exercise Clause of the First Amendment to the United States Constitution.

214. The Defendants Fredrickson, Magnuson and Kenneficks' acts were in retaliation for the Plaintiff's exercise of his civil rights secured by the Free Exercise Clause of the First Amendment to United States Constitution, specifically his expression of his religious belief in concordance with the Balfour Declaration, that the Jewish tribes (the State of Israel) are sovereign over the lands west of the Jordan River from Eilat to Golan, including the Temple Mount; and that the Jewish people have every right to reconstruct the Tent of the Ark and pray on the Temple Mount; as the Catholics the right to pray at the Vatican, the Orthodox Christians at the Hagia Sophia; the Anglican Communion at Canterbury Cathedral; the Pilgrims in Plymouth and the Wampanoag in Aquinnah.

215. The Defendants the Catholic Church of America, the Society of Jesus, Loyola Marymount University, the Vatican and ALSAC/St. Jude through its agents and employees by conspiring aiding, abetting, concealing, obstructing, receiving property known to be purloined, intimidating, false accusations and unlawfully influencing authorities to abridge the Plaintiff's Constitutional Rights of Free Exercise of Religion, Petition and Property, and violations of other Federal and State laws in revenge for the acts of Plaintiff's Uncle which uncovered the Defendants' role conspiring, concealing and smuggling WWII Nazi war criminals, collaborators and WWII stolen assets into the United States.

216. Defendant Town of Yarmouth has intentional refused and failed to exercise its proper supervision of its agents and employees to mitigate and prevent further transgressions and violations.

217. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, and in gross and reckless disregard of Plaintiff's Constitutional Rights.

218. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT FIVE

### VIOLATIONS OF RIGHTS SECURED BY THE SPEECH, ASSEMBLY & PETITION CLAUSES OF THE FIRST AND EQUAL PROTECTION CLAUSES OF FOURTEENTH AMENDMENT (42 U.S.C. § 1983 – DEFENDANTS KAMALA HARRIS & ET AL)

219. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

220. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

221. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Petition. Due Process and Equal Protection Clauses of the United States Constitution.

222. The simplest interview of notary Doris Tucker under oath would show that the late attorney Joe Ling intimidated and threaten notary Tucker with loss of her income and physical violence unless she participated in the suborning of her perjury with Defendant attorney Margaret Morrow to mislead the Plaintiff and the Court into believing that notary Tucker signed the jurat during Dorothy Horwitz's lifetime.

223. In January 2015, Defendant Kamala Harris, Attorney General for the State of California announced her bid for the U.S. Senate.  She had married Defendant Douglas Emhoff in August of 2014.  She has publicly stated that she is called "Momala" by her step-children and has long-known the importance of the JNF "Blue Box".

224. On February 8, 2015, the Plaintiff sent Defendant Harris his first request for a thorough investigation of Attorney Ling and McManus related to the Horwitz Estate.  This request was renewed and directed specifically towards the subornation of the perjury of notary Doris Tucker and the forgery of the Jurat.

225. At all relevant times, Defendant Harris knew that an elderly Jewish woman proud to be Jewish on her deathbed, would never on her 'deathbed' execute a crude "adumdum' to bequeath ALL her rare Judaica and Jewish heirlooms to a Catholic institution, nor would she forget all Jewish and U.S. Navy charities on a "new list'.

226. During her initial investigation, Defendant Harris learned from her Jewish husband that the Horwitz Estate controversy was part of a criminal conspiracy involving McManus, Lisman, Robert Mehrabian, GDC entertainment attorneys Scott Edelman, Barry K Rothman, Douglas Wolf, Congressman Adam Schiff, Long Beach attorneys Joe Ling, Margaret E. Morrow, Joseph Mirkovich and Leigh-Ellen Louie for the unlawful benefit of Teledyne, USC, ALSAC, the Catholic Church and themselves.

227. Defendant Harris was advised in the Fall of 2016 by her husband Defendants Harris, Schiff and others that her success in her 2016 Senatorial race may be dependent on her protection of and continued political support from the McManus conspirators including Ling and Edelman.

228. At all relevant times to the present, Defendant Harris has refused and used her government position to intimidate and dissuade the other Defendants, including the LAPD, local FBI, jurists on the appellate bench and others to refuse to order or conduct even the simplest of investigation including an interview under oath of notary Doris Tucker.

229. At all relevant times to the present, Defendant Harris has refused and used her government position to intimidate and dissuade the other Defendants, to investigate the criminal activities of Michael A. McManus and his Novavax co-conspirators who in 2019 and 2020 intentionally released the SARS-CoV2 virus in Wuhan, Milan, and New York.

230. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, in violation of the Rules of Professional Conduct and in gross and reckless disregard of Plaintiff's Constitutional Rights.

231. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff and the Nation.

## COUNT SIX

## VIOLATIONS OF RIGHTS SECURED BY THE SPEECH, ASSEMBLY & PETITION CLAUSES OF THE FIRST AND EQUAL PROTECTION CLAUSES OF FOURTEENTH AMENDMENT (42 U.S.C. § 1983 – DEFENDANTS ADAM SCHIFF & ET AL)

232. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

233. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

234. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the First and Fourteenth Amendments to the United States Constitution.

235. During July 1993, the prestigious IEEE Computer Journal published an article co-author by noted US Air Force Intelligence Directorate and MITRE scientists Clifton and Wefer which specifically described the Plaintiff's innovative technologies as among leading, state-of-the-art tools for the remote surveillance, targeting and execution of real-time targets.

236. Among the Plaintiff's competitors were Raytheon, Texas Instrument, and one of its subcontracts, Teledyne of Los Angeles.  This competition increased after it became known in 1995 that the Plaintiff had established a strong alliance with one the U.S. Navy's top scientist, Dr. Parvis Soltan, of the NOSC Lab in San Diego.  Dr. Soltan, an Iranian immigrant, was one of the Nation's most respected Muslim scientists.

237. From at least 2015, the Plaintiff advised those Defendants in positions of authority, including Defendants Harris, Schiff, Pelosi, Stratton, Murphy, Egerton, Lavin, Dhanidina, Moore and members of the LAPD and YPD,  that an elderly Jewish woman proud to be Jewish on her deathbed, would never on her 'deathbed'  execute a crude "adumdum' to

bequeath ALL her rare Judaica and Jewish heirlooms to a Catholic institution, nor would she forget all Jewish and U.S. Navy charities on a "new list'

238. From at least 2015, the Plaintiff advised these Defendants in positions of authority, including Defendants Harris, Schiff, Pelosi, Stratton, Murphy, Egerton, Lavin, Dhanidina, Klausner, Snyder, Waterstone, Moore, LAPD, Fredrickson, YPD that McManus posed a grave danger to our  Nation based on evidence that they were able to affirm.  Motivated principally by religious bias, and secondarily by personal avarice, the these Defendants, individually and jointly, intentionally and knowingly aided, abetted and furthered the planning and execution of the  SARS-CoV2 pandemic, believing it would have only a controlled impact on the United States sufficient to embarrass the Trump Administration.

239. At all relevant times, all of the Defendants knew that an elderly Jewish woman proud to be Jewish on her deathbed, would never on her 'deathbed'  execute a crude "adumdum' to bequeath ALL her rare Judaica and Jewish heirlooms to a Catholic institution, nor would she forget all Jewish and U.S. Navy charities on a "new list'.

240. At all relevant times, all of the Defendants knew that the Email sent to Defendant on April 19, 2019 to Defendant Waterstone was protected speech requesting assistance and informing of a true belief and opinion of the Plaintiff regarding the safety of the community.

241. At all relevant times, Defendants Harris and Schiff knew that an elderly Jewish woman proud to be Jewish on her deathbed, would never on her 'deathbed'  execute a crude "adumdum' to bequeath ALL her rare Judaica and Jewish heirlooms to a Catholic institution, nor would she forget all Jewish and U.S. Navy charities on a "new list'.

242. During their cursory inquiry, Defendants Harris and Schiff learned that the Horwitz Estate controversy was part of a criminal conspiracy involving McManus, Lisman, Robert Mehrabian, GDC entertainment attorneys Scott Edelman, Barry K Rothman,  Douglas Wolf, Congressman Adam Schiff, Long Beach attorneys Joe Ling, Margaret E. Morrow, Joseph Mirkovich and Leigh-Ellen Louie for the unlawful benefit of Teledyne, USC, ALSAC, the Catholic Church and the conspirators.

243. At all relevant times to the present, Defendant Harris and Schiff have used their official positions to intimidate and dissuade the other Defendants, including the LAPD, local FBI, jurists on the appellate bench and others from conducting  even the simplest of investigation of the aforementioned crimes including an interview under oath of notary Doris Tucker.

244. At all relevant times to the present, Defendant Harris and Schiff have refused to conduct and used their official government positions to intimidate and dissuade the other Defendants, to investigate the criminal activities of Michael A. McManus and his Novavax

co-conspirators who in 2019 and 2020 intentionally released the SARS-CoV2 virus in Wuhan, Milan, and New York.

245. At all relevant times to the present, Defendants Harris and Schiff obstructed, refused and used their official positions to intimidate and dissuade the other Defendants and persons of authority from investigating the criminal conspiracy of Joseph Biden, Mykola Zlochevsky Natasha Lisman, Nancy Pelosi, Diane Feinstein, Jerome Nadler, Heather Sawyer,  Leonid, Yevgeny and Alexander Vindman, ongoing schemes to unlawfully sabotage Russian prime minister Putin beginning with Dartmouth alums Leonid Vindman and Heather Sawyer, and the Dartmouth Club of Moscow, Defendant Lisman direct ties to Zlochevsky and the purchase of the Horwitz Ukrainian Judaica, employment of Hunter Biden and Paul Pelosi, and criminal espionage of Leonid, Yergeny and Alexander Vindman providing Ukrainian and Israeli officials with classified American information, documents and plans.

246. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, in violation of the Rules of Professional Conduct and in gross and reckless disregard of Plaintiff's Constitutional Rights. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT SEVEN

### VIOLATIONS OF RIGHTS SECURED BY THE SPEECH, ASSEMBLY & PETITION CLAUSES OF THE FIRST, SECOND, FOURTH, SEVEENTH AND EQUAL PROTECTION CLAUSES OF FOURTEENTH AMENDMENT (42 U.S.C. § 1983 - DEFENDANTS)

247. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

248. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

249. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the First and Fourteenth Amendments to the United States Constitution.

250. The Constitutional Right to "Due Process" and other clauses of the 14th Amendment are codified as to mail and wire fraud in acts by government officials as :18 USC §1346 which reads: ... the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services."  This Right includes 18 USC $1341 Frauds and Swindles; and 18 USC $1349 Attempts and Conspiracies.

251. From 2014 to the present, Defendants Stratton, Sadowsky, Glen Kehlmann, Gregory Kehlmann, Barbara Biller, Elena Sadowsky Kehlmann, Ann Egerton, Lavin, Dhanidina, Moore and Waterstone conspired to defraud, damage and deprive the Plaintiff of his personal safety, health, property and honest services of government officials including by, but not limited to, the following acts:

252. Defendant Stratton, presiding in <u>Solomon v Louie</u>, BP153887, intentionally conspired through unlawful ex parte communications with Defendants Ling, Morrow and Mirkovich to prepare a forged adumdum to admit into evidence a pivotal forged document by scheme and artifice.

253. Defendant Stratton, presiding in <u>Solomon v Louie</u>, BP153887, intentionally conspired through unlawful ex parte communications with Defendants Ling, Morrow and Mirkovich to admit into evidence a pivotal forged document by scheme and artifice;

254. Defendant Stratton, presiding in <u>Solomon v Louie</u>, BP153887, intentionally conspired through unlawful ex parte communications with Defendants Ling, Morrow and Mirkovich by scheme and artifice, to bar the Plaintiff from further deposition and testimony regarding the subornation of perjury and forgery by said Defendant attorneys and notary Doris Tucker.

255. Defendants Stratton presiding in <u>Solomon v Louie</u>, BP153887, Murphy, McManus, Harris, Lavin, Egerton and Snyder engaged and conspired with each other ex parte, and with Defendants Glenn Kehlmann, Barbara Biller, Gregory Kehlmann and Elana Sadowsky Kehlmann to investigate, disrupt, sabotage and report ex parte detailed personal information and relations of the Plaintiff including but not limited to personal, family and professional relations and ties to the Jewish community, daily activities, medical and scientific affiliations at Harvard Medical, US Department of Defense, Intelligence, EU, Israel, China, Hong Kong and Korea.

256. On or about June 2017, said Massachusetts Defendants learned that the brutal murder Dr. Lina Bolaños, 38, and her fiance, 49-year-old Dr. Richard Field, inside their penthouse condominium Friday night, May 5, 2017, was erroneously ordered because Defendant Stratton and McManus believed that they were investigating the Defendant Kehlmanns.

257. Defendants Stratton, Murphy, Egerton, Lavin and Snyder refused to recuse themselves from official acts related to the Plaintiff in violation of the Federal and State Judicial Canons and Code of Conducts, and the Laws of Massachusetts and California.

258. Said aforementioned acts deprived the Plaintiff of his Constitutional Right to "Due Process" and other Rights.

259. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, in violation of the Rules of Professional Conduct and in gross and reckless disregard of Plaintiff's Constitutional Rights. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

### COUNT EIGHT

### RIGHTS SECURED BY THE 'FREE EXERCISE' CLAUSES OF THE FIRST, FOURTH AND EQUAL PROTECTION CLAUSES OF FOURTEENTH AMENDMENT (42 U.S.C. § 1983 - DEFENDANTS)

260. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

261. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

262. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the First and Fourteenth Amendments to the United States Constitution.

263. The Plaintiff's Mother is 96 years old, diagnosed with the stages of Alzheimer's. A few years ago, she recounted her story to young scribes of the Horowitz Family, eighty years her junior, where it was placed in a collection which dates back over 900 hundred years. She was looking forward to having the personal effects and artwork of her siblings, Dorothy and Walter Horwitz.

264. Defendants Aparicio, Ling, Morrow, Mirkovich, Louie, Aparicio, Stratton, Murphy, Egerton, Lavin, Dhanidina knowingly, with the most depravity of intent, and wanton disregard for the emotionally and physically safety of an elderly person, intended to inflect grievous emotional harm upon and deprive the elderly sister of Walter and Dorothy Horwitz of comfort of their personal papers, photographs, albums, collectibles, heirlooms and Judaica.

265. Said aforementioned acts committed against the elderly often accelerate their deaths and as such tantamount to murder. They have been adjudged by the Sanhedrin of Yad Vashem among the most depraved of crimes against humanity and the Jewish Community, invoking the Edict of Lot (Genesis 19:7-13).

266. Defendants acts were intentional, malicious, willful, wanton, obdurate, unlawful, in violation of the Rules of Professional Conduct and in gross and reckless disregard of Plaintiff's Constitutional Rights.

267. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT NINE

## VIOLATIONS OF RIGHTS SECURED BY SECOND AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) (STATE OF MASSACHUSETTS)

268. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

269. Defendant Commonwealth of Massachusetts enabled its agents to act under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Second Amendment to the United States Constitution.

270. On April 22, 2019, Defendant Fredrickson suspended the Plaintiff's LTC based on M.G.L. 140 § 131, which reads: [may suspend a license issued] "if, in a reasonable exercise of discretion, the licensing authority determines that the licensee is unsuitable … A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that the applicant or licensee may create a risk to public safety;"

271. The clause of "behavior that suggests that the license may create a risk to public safety" is too vague and indefinite, and thus impermissible uncertainty on which to deprive any person of their Constitutional Rights.  The subject statute is also unconstitutionally vague and overly broad because they are worded in a standard-less way that invites arbitrary enforcement.

272. The "unsuitability" clause also invites the corruption of the licensing authority and the reviewing court, as Alexander Hamilton has observed in his Federalist Paper, #83 which reads:

"The friends and adversaries of the plan of the [Constitutional] convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury: … it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government… as a barrier to the tyranny of popular magistrates in a popular government … arbitrary methods of prosecuting pretended offences, and arbitrary punishments upon arbitrary convictions have ever appeared to me to be the great engines of judicial despotism … The excellence of the trial by jury in civil cases …The strongest argument in its favour is, that it is a security against corruption … By increasing the obstacles to [corruption] it discourages attempts to seduce the integrity of [magistrate or court]. The temptations to prostitution, which the judges might have to surmount, must certainly be much fewer while the co-operation of a jury is necessary, than they might be if they had themselves the exclusive determination of all causes."

273. Defendants' statues and acts are in gross and reckless disregard of Plaintiff's Constitutional Rights.

274. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

## COUNT TEN

## VIOLATIONS OF RIGHTS SECURED BY SEVENTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) (STATE OF CALIFORNIA)

275. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

276. Defendant State of California instructed its officers and agents to take acts under color of state law which deprived Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Fourth, Seventh and Fourteenth Amendments to the United States Constitution.

277. Cal Probate Code §17006 reads: "There is no right to a jury trial in proceedings under this division concerning the internal affairs of trusts. (Enacted by Stats. 1990, Ch. 79.)"

278. From at least 1990 when §17006 was ratified, the Governor and jurists of the Supreme Court of the State of California conspired, authorized, aided and abetted an 'epidemic' of financial abuse by State-licensed jurists, attorneys, trustees and fiduciaries, best illustrated by the case of California attorney and trustee Gunderson, by shielding the "internal affairs' of its trusts from review by impartial juries.

279. In the present Horwitz litigation, it has allowed the religious bias of the jurists to prevail eviscerate common sense – a elderly Jewish on her deathbed bequeathing millions in the rare Judaica to a Catholic institution -- and the Laws of California $16003 (impartiality of trustee) and with arrogant impunity.

280. Cal Probate Code §17006 invites corruption of the court, as Alexander Hamilton has observed in his Federalist Paper, #83 which reads:

"The friends and adversaries of the plan of the [Constitutional] convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury: ... it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government... as a barrier to the tyranny of popular magistrates in a popular government ... arbitrary methods of prosecuting pretended offences, and arbitrary punishments upon arbitrary convictions have ever appeared to me to be the great engines of judicial despotism ... The excellence of the trial by jury in civil cases ...The strongest argument in its favour is, that it is a security against corruption ... By increasing the obstacles to [corruption] it discourages attempts to seduce the integrity of [magistrate or court]. The temptations to prostitution, which the judges might have to surmount, must certainly be much fewer while the co-operation of a jury is necessary, than they might be if they had themselves the exclusive determination of all causes."

281. Presently and for all relevant periods, the Plaintiff, a Horwitz Family Trust beneficiary, has been a resident of Massachusetts.  At no time did he voluntarily subject himself or his assets to California State Law.  On at least three occasions during the prosecution of <u>Solomon v Louie</u>, LASC BP153887 Solomon he formally requested and moved for a jury trial.

282. In accordance with the Seventh Amendment to the Constitution, the Plaintiff has right to a civil jury trial in disputes over $25 ($75,000), including those involving the 'internal affairs' of the Trust to extent they controlled the disbursements to the Plaintiff.  In the present case, this Right extends to the State under the 'diversity' clause and the 14th Amendment.

283. Defendants' statues and acts are in gross and reckless disregard of Plaintiff's Constitutional Rights.

284. Defendants' acts inflicted substantial emotional, property and financial damages on the Plaintiff.

**COUNT ELEVEN**

**VIOLATIONS OF RIGHTS SECURED BY FIRST, SECOND, FOURTH, SEVENTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) BY ACTS VIOLATING 18 USC §1961, §1962, ACTIONABLE BY 18 USC §1964, §1966**

285. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

286. The specific acts herein are part of the Defendants' ongoing interstate corrupt enterprise. In addition to the specifically named Defendants herein, each and every Defendant of this litigation aided and abetted this Count.

287. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Fourth, Seventh  and Fourteenth Amendments to the United States Constitution.

288. All of the Defendants aided, abetted and conspired as members of an ongoing corrupt enterprise ("McManus Cartel") to violate 18 USC §1831 and §1832 (relating to economic espionage and theft of trade secrets), and 18 USC § 1951 (relating to interference with commerce, robbery, or extortion).

289. All of the Defendants aided, abetted and conspired, individually and as members of an ongoing corrupt enterprise ("McManus Cartel") to interfere with the interstate commerce by the aforementioned predicate, criminal acts of  forgery, bribery, perjury, wire and mail fraud, economic espionage, intimidation by threats of violence, violence and murder, unlawful search and seizure of property, accepting bribes and gratuities, obstruction of

justice, and fraud on the Courts; and were primarily motivated by religious-bias. These crimes constitute predicate acts under the 18 USC §1964.

290. The Defendants' further unlawful acts and conspiracies deprived Plaintiff while acting under the color of State law of the Rights by secured by the 1st, 2nd, 4th and 7th Amendments the United States Constitution actionable under 18 USC §1983.

291. The Plaintiff seeks injunctive and declaratory relief and protections to enable his full exercise of his Rights guaranteed by the 1st, 2nd, 4th and 7th Amendments to the Constitution, 18 USC §1964 and other Federal and State statutes, compensatory and other damages as the Court deems reasonable.

## COUNT TWELVE

## VIOLATIONS OF RIGHTS SECURED BY ELECTION CLAUSE, THE FIRST, SECOND, FOURTH, SEVENTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) BY ACTS VIOLATING 18 USC §1961, §1962, ACTIONABLE BY 18 USC §1964, §1966 & BIOLOGICAL WEAPONS 18 USC § 175–178

292. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

293. The specific acts herein, and the intentional planning, executing, aiding and abetting before or after the murder of more than one million citizens of the United States many Nations of world by SARS-CoV2 and related actions,  are part of the Defendants' ongoing interstate and international corrupt enterprise, in which each and every Defendant herein, together with their co-conspirators and accomplices are guilty. In addition to the specifically named Defendants herein, each and every unnamed Defendant of this litigation aided and abetted this Count.

294. On or about 1998, McManus, who had the Lebanon desk in the Reagan White House, facilitated the purchase of the sole Anthrax vaccine manufacturer for the U.S Department of Defense by Muslim Lebanese-German citizen Fuad El-Hibri.  In return, McManus was appointed a director of Novavax (NVAX) the principal biopharma company developing novel Anthrax vaccines.

295. A few years later, according the final FBI Report in 2007, on or about September 11, 2001, noted USARMIID scientist Dr. Bruce Ivins intentionally mailed fatal anthrax to US Senators and others in order to increase the funding for Anthrax research resulting in three deaths.

296. However, the principal beneficiaries were El-Hibri (McManus) and Novavax, receiving research and vaccine grants of over $1 billion dollar US.

297. On, about or thereafter February 8, 2015, all of the Defendants holding position in government of authority were made aware that McManus, a bitter disenfranchised perpetrator of schemes against PRC China, a director of Novavax since 1998 and a direct beneficiary of the 9/11 Anthrax terrorism by a USARMIID scientists, presented a biological warfare threat to the United States.

298. During the Summer and Fall of 2019, Defendants Harris, Pelosi, Schiff and Biden conspired with McManus and his accomplices including Wuhan ophthalmologist Li Wenliang, MD to insure that San Francisco would not be a target.

299. As a result of their corrupt acts, as of September 25, 2020, San Francisco with a population of 889,000 has 99 Covid deaths (12/100K) while New York City has 23,792 with a population of 8,779,000 (273/100K) – a rate 22 times that San Francisco.

300. Each of said Defendants having position as officer, employee or jurist of the Court, or license thereof from a State or United States government, had an affirmative obligation under 18 U.S. Code § 4. Misprision of felony to notify the appropriate authorities and insure that a thorough investigation addresses the threat.

301. Each of said Defendants, their co-conspirators and accomplices, by their acts intentionally or recklessly enabling, aiding, abetting,  concealing, interfering with the discovery, financing, or in any other way furthering the murder of Dorothy Horwitz, the many others from Samantha Smith to the present, and those who have died from SARS-CoV2 or its consequences are guilty of conspiracy, aiding and abetting the ongoing 'McManus' criminal enterprise of murder, subject to California Penal Code §31, Massachusetts Chap 265 § 37 and other State and Federal Laws.

302. Nearly all of the Intelligence Agencies of countries of the European Union, Israel, Saudi Arabian, Gulf States and Asian Pacific including China, Koreas, Japan, Taiwan have conclusively attributed the SARS-CoV2 pandemic to the McManus Cartel including Mitt Romney, Kamala Harris, Joseph Biden, Nancy Pelosi and others. This position is further evidenced by recent papers by asylum Chinese, Harvard-MIT Broad Institute, US Los Alamos Laboratory and European counterparts that the SARS-CoV2 virus did not recently 'jump' to human hosts, and the pattern of dissemination, including 'super-spreader' events including the 10/5/20 'White House' events do not exhibit a natural pattern – i.e. they were artificial assisted'  It is the Plaintiff's belief and opinion said agencies and affiliates are taken ongoing actions to eliminate all said threats and realize retribution against the perpetrators and their heirs for the deaths and damages inflicted.

303. The conspiracy and actions taken by Defendants were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and

laws of the United States, specifically the Fourth, Seventh and Fourteenth Amendments to the United States Constitution.

304. All of the Defendants aided, abetted and conspired as members of an ongoing corrupt enterprise ("McManus Cartel") to violate 18 USC §1831 and §1832 (relating to economic espionage and theft of trade secrets), and 18 USC § 1951 (relating to interference with commerce, robbery, or extortion).

305. All of the Defendants aided, abetted and conspired, individually and as members of an ongoing corrupt enterprise ("McManus Cartel") to interfere with the interstate commerce by the aforementioned predicate, criminal acts of forgery, bribery, perjury, wire and mail fraud, economic espionage, intimidation by threats of violence, violence and murder, unlawful search and seizure of property, accepting bribes and gratuities, obstruction of justice, and fraud on the Courts; and were primarily motivated by religious-bias. These crimes constitute predicate acts under the 18 USC §1964.

306. The Defendants' further unlawful acts and conspiracies deprived Plaintiff while acting under the color of State law of the Rights by secured by the 1st, 2nd, 4th and 7th Amendments the United States Constitution actionable under 18 USC §1983.

307. The Plaintiff seeks injunctive and declaratory relief and protections to enable his full exercise of his Rights guaranteed by the 1st, 2nd, 4th and 7th Amendments to the Constitution, 18 USC §1964 and other Federal and State statutes, compensatory and other damages as the Court deems reasonable.

### INJUNCTIVE RELIEF ALLEGATION & RELIEF (FREDRICKSON)

308. Plaintiff is presently and continuously injured by Defendant Fredrickson's enforcement of Defendants' unlawful acts and insofar as those provisions violate Plaintiff's rights under the Due Process, Second and Fourteenth Amendments by prohibiting the lawful use and ownership of constitutionally protected arms.

309. If not enjoined by this Court, Defendants will continue to enforce and customs in derogation of the constitutional rights of Plaintiffs and similarly situated law-abiding people.

310. Plaintiff has no plain, speedy, and adequate remedy at law.

311. Wherefore, the Plaintiff requests that this Court issue an injunction ordering the Defendant Fredrickson to show cause for suspension based on a true danger to the community or person posed by the Plaintiff's LTC beyond his protected speech and opinion; or within 30 days or reinstate the Plaintiff's LTC for an equivalent to the remaining term from suspension or issue a full renewal; and return the Plaintiff's firearms and other items seized;

## EMERGENCY INJUNCTIVE RELIEF ALLEGATION & RELIEF ON SARS-COV2

312. Plaintiff is presently and continuously injured by Defendants Biden, Harris, Schiff, Pelosi, and Waterstone schemes to interfere with and delay Federal and State investigations of their and other direct involvement in the evolution of the SARS-CoV2 pandemic and its intentional dissemination including the Justice Barrett event at the White House on October 5, 2020.

313. If not enjoined by this Court to cease interfering with Plaintiff's, Federal and State investigations, Defendants will continue to endanger the Plaintiff, this Court and the American people in derogation of the constitutional rights of Plaintiff and similarly situated law-abiding people.

314. Plaintiff has no plain, speedy, and adequate remedy at law except this injunction.

315. Wherefore, the Plaintiff requests that this Court issue an injunction ordering the Defendants' to cease interfering with the Plaintiff's 'privileged communications' with authorities, victims and those potentially at risk.

## EMERGENCY INJUNCTIVE RELIEF ALLEGATION & RELIEF RE HORWITZ ESTATE

316. Plaintiff is presently and continuously injured by Defendant State of California protection and enforcement of Defendants' unlawful acts and insofar as those provisions violate Plaintiff's rights under the First, Fourth, Fifth, Seventh and Fourteenth Amendments by seizure of the Plaintiff's property without equal protection and due process of law.

317. If not enjoined by this Court, Defendants will continue to enforce and customs in derogation of the constitutional rights of Plaintiffs and similarly situated law-abiding people.

318. Plaintiff has no plain, speedy, and adequate remedy at law.

319. Wherefore, the Plaintiff requests that this Court issue an order and injunction ordering the Defendant Moore to conduct an immediate and thorough investigation of the signing of the 'adumdum' Jurat by notary Doris Tucker to determine the date, time and circumstances including each and every person who communicated with her and the content of said communication, the time and circumstances when she was asked to 'return' to sign the Jurat, the person who presented the unsigned Jurat to be signed, and each person and the location where she signed the Jurat.

320. And wherefore, the Plaintiff requests that this Court issue an order and injunction ordering the Defendants' State of California, Ling, Morrow, and Mirkovich, Stratton and Egerton, and the new Charities List, those in possession and all other conspirators to within 30 days identify in detail and with photographs or true copies of documents and art, all of the assets

of the Horwitz Estate and Trust, identify and return all untransmuted property of Walter Horwitz including but not limited to original and prior collected art, Horwitz Judaica and heirlooms, and all personal papers, financial records, photographs and videos of Walter and Dorothy Horwitz for the benefit and appreciation of the Mother of the Plaintiff, in joint trust of the Plaintiff and his brother.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

1. For the grant of emergency injunctions described in the Injunctive Relief section;
2. It is the understanding and belief of the Plaintiff that the Acts of the Defendants related to the Horwitz Estate and the SARS-CoV2 pandemic have been adjudged the most depraved and egregious of 'war crimes' by official government and NGO entities throughout the world.  This has led to the quiet execution of all of those and their heirs who aided and abetted the  SARS-CoV2 dissemination or continue to hold or benefit from the assets of Horwitz Estate purloined by the reason of 'deathbed adumdum".   This Plaintiff requests that this Court rule that said efforts to inform relevant government authorities and those who may be affected is 'protected expression of opinion and speech."
3. For entry of judgment declaring that the April 19, 2019 Email to Defendant Waterstone was Constitutionally protected speech;
4. For entry of judgment declaring that Defendants Waterstone, Moore, Fredrickson and others characterization as an 'immediate danger' and subsequent acts were part of an artifice and scheme to provoke, embarrass, cause emotional duress, enable criminal and terrorist attacks upon his person and community, and  abridge the many Constitutional Rights of the Plaintiff;
5. For entry of judgment declaring that the provisions of M.G.L. 140 §131 conveying the license authority the authority to 'suspend' a valid LTC on grounds of "unsuitability" without warrant or prior review is facially unconstitutional;
6. For entry of judgment declaring that the provisions of M.G.L. 140 §131 conveying the license authority to search and seize the firearms of the Plaintiff on the basis of his personal finding of "unsuitability" without warrant or prior review is facially unconstitutional;
7. For entry of judgment awarding the compensatory damages against the Town of Yarmouth and Defendant Officers and agents, individually and jointly, in the amount of the $10,000,000 for damages suffered, $9,500,000 to be placed in a charitable trust for the training of officers to protect Jewish institutions, congregations and neighborhoods.
8. Order the Defendants to return all of Plaintiff's firearms, ammunition, cases, locks or equivalents;

9. Order the Yarmouth Police to vacate the suspension of the Plaintiff's LTC, enter a letter of apology and mistake into the official record, and re-issue the Plaintiff's LTC for a term at least equivalent to the remaining term when the LTC was suspended.

### UNDER COLOR OF CALIFORNIA LAW CAUSING DAMAGE IN MASSACHUSETTS

10. For entry of judgment declaring that Defendants Stratton, Murphy, Egerton, Lavin and Dhanidina unlawfully conspired, motivated by religious bias, to abridge the Plaintiff many Constitutional Rights including under the 1st, 4th, 7th, and 14th Amendments under the color of Law and cause substantial damage in Massachusetts, said damage included the grievous and depraved elder abuse and infliction of emotional distress upon the elderly sister of Walter and Dorothy Horwitz.

11. For entry of judgment declaring that the provision of California Probate Code §17006 denying a jury trial where there is a Federal jurisdictional diversity of parties and the amount in controversy is greater than $75,000 is unconstitutional;

12. For entry of judgment declaring that all Defendants, acting out of personal avarice and ambition conspired, aided, abetted or attempted to commit predicate crimes under 18 USC §1961-5 to abridged his many Constitutional Rights including under the 1st, 2nd, 4th, 7th, and 14th Amendments under the color of Law and cause substantial damage.

13. For entry of judgment declaring that all Defendants, acting because of religious bias, conspired, aided and abetted, and those having official authority by failed to use their power of their office to investigate the reasonable requests of Plaintiff, to abridged his many Constitutional Rights including under the 1st, 2nd, 4th, 7th, and 14th Amendments under the color of Law, and cause substantial damage.

14. For entry of judgment declaring that the 'adumdum' to the Dorothy Horwitz Family Trust is a forgery by alteration and is null and void.

15. For entry of judgment ordering the Defendants to inventory in details, assemble and distribute all of the assets of any sort and all untransmuted property found in the Horwitz home, safe deposit boxes and every other location to the named beneficiaries of the 2012 Dorothy Horwitz Family Trust according to the following: $25,000 to Nicolas Sanchez and all other cash, assets and property to named nephews, Dennis and Murray Solomon jointly within 30 days.

16. For entry of judgment awarding the compensatory damages against the State of California and the Defendants, individually and jointly, in the amount of the $100,000,000 for damages suffered, $94,789,000 to be placed in a charitable trust for the welling being of remaining Holocaust victims, and the funding of independent network to educate and act against the abuse of elderly beneficiaries and their trustors.

17. For entry of judgment that Defendants Biden, Harris and other Defendants conspired to defraud the United States and endanger its citizens intentionally failing to act against the McManus cartel.

18. For entry of judgment that Defendants Biden and Harris conspired to defraud the United States and endanger its citizens by intentionally failing to act against the McManus cartel.

19. For an award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988;

20. For such further legal, compensatory, punitive and equitable relief as the Court may deem just and proper.

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11

Verified and submitted on October 14, 2020:

*/s/ Dennis Solomon*

Dennis Solomon, Petitioner pro se
75 North Main Street #552
Randolph, MA 02368
Phone: 508-394-9221   Fax: 617 890 1947
svwolfpm@gmail.com

See Attachments Pages